# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: THOMAS P. TUREK and PAMELA BAKER-TUREK, Debtors | * * * * | Chapter 13 |
| IN RE: THOMAS P. TUREK and PAMELA BAKER-TUREK, Movants | * * * * | Case No. 1-04-bk-03910 |
| vs. | * * | |
| CHARLES J. DEHART, III, Chapter 13 Trustee, Respondent | * * * | |

*********************************************************************

| | | |
|---|---|---|
| IN RE: ALLEN L. KUYKENDALL and MICHELE J. KUYKENDALL a/k/a MICHELE MACY a/k/a MICHELE DAVIS, Debtors | * * * * * * | Chapter 13 |
| ALLEN L. KUYKENDALL and MICHELE J. KUYKENDALL a/k/a MICHELE MACY a/k/a MICHELE DAVIS, Movants | * * * * * * | Case No.: 1-04-bk-00505 |
| vs. | * * | |
| CHARLES J. DEHART, III, Chapter 13 Trustee, AMERICAN GENERAL CONS. DISCOUNT CO., F&M TRUST, B-LINE HOUSEHOLD CREDIT SERVICES, DELL FINANCIAL SERVICES, PATRIOT FEDERAL CREDIT UNION, T-MOBILE, PREMIER BANKCARD, and CAPITAL ONE BANK, Respondents | * * * * * * * * * * | |

**OPINION**

Under what terms may a debtor accelerate payments under a confirmed chapter 13 plan and obtain an early discharge? This issue is raised in the two cases addressed in this opinion albeit in different procedural contexts. In the case of Thomas and Pamela Turek ("the Tureks"), the issue arose in the context of a proposal to refinance a residential mortgage. In the case of Allen and Michele Kuykendall ("the Kuykendalls"), the issue arose after the Kuykendalls sold their home and used the proceeds to pay off their plan. The Tureks seek an order permitting them to refinance the mortgage on their home and to "pre-pay" their chapter 13 plan, which is not scheduled to be completed until 2009. The Kuykendalls seek an order compelling disgorgement of funds distributed by the chapter 13 trustee ("the Trustee") to pay the allowed claims of unsecured creditors. These funds were generated by the sale of the Kuykendalls' home and paid to the Trustee, who distributed the funds to the first mortgage holder, Chase Manhattan Mortgage Co. ("Chase"). Because Chase was paid in full at settlement, the mortgage company returned the payment to the Trustee, who then distributed the funds pro rata to unsecured creditors.

**Procedural and Factual History**

*The Turek case*

On June 25, 2004, the Tureks filed a chapter 13 petition. Their plan, which was confirmed on January 14, 2005, proposed payments to the Trustee of $350.00 per month for a maximum of fifty-seven months to the extent necessary to fund the plan.[1] The only claims

---

[1] The Tureks do not explicitly commit to paying $19,950.00 to the Trustee in their plan. Both parties employ this figure in their arguments and calculate it by multiplying $350.00 by 57. However, the plan does not guarantee payments of $350.00 each month for exactly 57 months. Rather, it merely states that $350.00 per month "over a period of a maximum of 57 months" will be paid to the trustee "as is necessary for the execution of the plan."

Case 1:04-bk-03910-MDF   Doc 48   Filed 07/21/06   Entered 07/21/06 14:22:11   Desc
Main Document      Page 2 of 17

specifically proposed to be paid through the plan were administrative claims, the secured claim of First Federal Credit Union and mortgage arrearages owed to Litton Loan Corp. ("Litton").[2] On August 4, 2004, Litton filed a proof of claim for $11,931.12 in mortgage arrears with a total secured claim of $86,535.09. The Tureks' "Plan Narrative" includes the following relevant language:

> 1. Funding of Plan: The Debtor submits to the supervision and control of the Trustee all or such portion of the Debtors' future earnings or other future income as is necessary for the execution of the Plan, as follows
>
>> A. The total amount of $350.00 per month which shall be paid to the Trustee from future earnings;
>> B. Other property/additional sums as necessary to fund [the] Plan,
>
> 2. Duration of [the] Plan: It is proposed that payments shall be made over a period of a maximum of 57 months as necessary to fund [the] Plan.
>
> * * * * *
>
> 4. Other Provisions:
>> r. Debtors shall have sole right to use and possession thereof (sic) during the pendency of this case, including the right to use, sell or lease such property in the ordinary course of the Debtor's (sic) affairs.
>
> 5. Revestment of Property in [the] Debtor: Property of the estate shall vest in the Debtor upon the closing of the case. Until the case is closed, all assets of the Debtor are protected by the automatic stay.

On February 1, 2006, the Tureks filed a motion to refinance the mortgage on their residence and to pay off the balance on their plan. Specifically, the Tureks' motion proposed to pay Litton directly from settlement proceeds with the balance to be remitted to the Trustee for distribution through the plan. The Trustee objected to this motion arguing that the Tureks' plan committed them to pay $350.00 for fifty-seven months, and if the Court granted the motion, it

---

[2] The loan is serviced by Mortgage Electronic Registration Systems ("MERS"), but for convenience, the loan will be referred to as the Litton Loan in this Opinion.

would enable the Tureks to alter that commitment without seeking approval to modify the plan. The Trustee asserted that as of the date of his objection the Tureks owed $13,500.00 to the plan, thus, they should be compelled to pay that amount in order to obtain a discharge. The Trustee did not object to Litton receiving full payment of its claim through the settlement, nor did the Trustee object to the early completion of the plan. Simply put, the Trustee takes the position that the Tureks promised to pay $19,950.00 into their plan and $13,500.00 must be paid to fulfill that commitment. On February 22, 2006, Litton joined in the Trustee's objection. A hearing was held on the matter on March 15, 2006. Briefs were subsequently filed by the Tureks and by the Trustee. The matter is ready for decision.

*The Kuykendall case*

On January 29, 2004, the Kuykendalls filed a chapter 13 petition and plan of debt adjustment. The plan provided, among other things, for payment of mortgage arrears to Chase in the approximate amount of $5,633.00 and for payment of real estate taxes to the Franklin County Tax Claim Bureau ("Franklin County") in the approximate amount of $1,400.00. The plan provided for a monthly payment of $200.00 for sixty months[3] After filing an amendment not relevant to the issues *sub judice*, the plan as amended was confirmed on July 15, 2004.

---

[3]The Kuykendalls' original plan proposed a monthly payment of $200.00 for sixty months. Prior to confirmation, an amended plan was filed proposing to pay $170.00 per month. After confirmation, the Kuykendalls and the Trustee entered into a stipulation to increase the monthly payments to the Trustee to $220.50 to provide for post-petition attorneys fees. The Trustee asserts that the base amount of the plan is $12,422.00, which is not disputed by the Kuykendalls.

4

Case 1:04-bk-03910-MDF    Doc 48    Filed 07/21/06    Entered 07/21/06 14:22:11    Desc
Main Document      Page 4 of 17

On November 23, 2005, the Kuykendalls sold their home. The settlement agent sent a check to the Trustee in the amount of $9,000.00 to pay off the balance of the plan. On December 7, 2005, the Trustee disbursed $5,568.40 to Chase and $1,400.00 to Franklin County. On December 28, 2005, Chase returned the funds to the Trustee because its claim had been paid in full at settlement. Franklin County similarly refunded the payment that it had received from the Trustee because its claim had been satisfied. The Trustee proceeded to distribute the amounts refunded by secured creditors to general unsecured creditors.

On February 24, 2006, the Kuykendalls filed the motion to disgorge the funds paid to unsecured creditors that is now before the Court. The Trustee objected to the disgorgement on grounds similar to his objection in the Turek case – the Kuykendalls' plan had committed them to paying a specific sum to their creditors through the plan and the payments sought to be disgorged were made according to the plan. None of the unsecured creditors named as Respondents objected to the motion.[4] The Trustee and the Kuykendalls have filed briefs on the matter, which is now ripe for decision.[5]

---

[4] In their brief, the Kuykendalls argue that they are entitled to a default judgment against the unsecured creditors named as Respondents in the motion requesting the disgorgement of funds. As I have determined that the Trustee, as the disbursing agent of the plan funds, properly paid the claims of unsecured creditors, and it is undisputed that the affected creditors held allowed unsecured claims, their failure to respond to the Kuydendalls' motion is irrelevant.

[5] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

## Discussion

"The super discharge granted in Chapter 13 is a legislative *quid pro quo*. In exchange for the debtor's commitment of all of his disposable income to a plan to pay creditors, he is discharged from debts that he would otherwise not be discharged from were he liquidating in Chapter 7." *In re Devine*, 1998 WL 386380, *12 (Bankr. E.D. Pa.). To confirm a chapter 13 plan that will not result in full payment to all creditors, if the trustee or an unsecured creditor objects, a debtor must devote all projected disposable income for the ensuing three years to the plan. 11 U.S.C. §1325(b)(1)(B). Chapter 13 plans generally are either: (1) "pot" plans or (2) percentage plans. "A percentage plan designates what percentage of its claim each general unsecured creditor will receive without stating an exact dollar amount the debtor must pay into the plan. . . ." *In re Golek,* 308 B.R. 332, 335 (Bankr. N.D. Ill. 2004) (citing *In re Witkowski*, 16 F.3d 739, 741 (7th Cir. 1994). "A pot plan, on the other hand, fixes the amount the debtor must pay into the plan, leaving in question the percentage each general unsecured creditor will receive in payment of its claim until all claims are approved." *Id.* A chapter 13 plan "is essentially a new and binding contract, sanctioned by the court, between the debtors and their pre-confirmation creditor." *Matter of Penrod*, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994), *citing In re L & V Realty Corp.,* 76 B.R. 35 (Bankr. E.D. N.Y. 1987); *In re Water Gap Village,* 99 B.R. 226, 229 (Bankr. D. N.J. 1989); *In re Ernst,* 45 B.R. 700, 702 (Bankr. D. Minn. 1985). "It is well established that a . . . plan is a contract between the debtor and its creditors that is subject to the general rules governing the interpretation of contracts under the law of the state in which the plan was confirmed." *In re Miller*, 253 B.R. 455, 458 (Bankr. N.D. Cal. 2000) (citing *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 588 (9th Cir.1993)(other citations omitted). Thus, "any ambiguity [in the chapter 13 plan] is interpreted against the debtor." *In re*

6

*Brawders*, 325 B.R. 405, 411 (9th Cir. BAP 2005). *See also In re Fawcett*, 758 F.2d 588, 591 (11th Cir. 1985) (as draftsman of a chapter 13 plan, a debtor "has to pay the price if there is any ambiguity about the meaning of the terms of the plan."). As with other contracts, a chapter 13 plan is subject to modification, but there are certain statutory limitations as specified in 11 U.S.C. § 1329.

> a.  *Does the early payoff of a chapter 13 plan constitute modification of the plan under Section 1329?*

A threshold matter confronting the Court is whether paying off a plan early constitutes a plan modification under 11 U.S.C. § 1329. Section 1329(a) provides that:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to –
>
> (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
>
> (2) extend or *reduce* the time for such payments; or
>
> (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.[6]

11 U.S.C. § 1329(a) (emphasis added).

---

[6] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), P.L. 109-8, §256, 119 Stat. 23, 11 U.S.C. §101 *et seq*. added paragraph 4 to §1329(a) permitting modification of a chapter 13 plan to reduce payments under the plan sufficient to enable a debtor to purchase health insurance for the debtor and his dependents. Because the petitions in the within cases were filed prior to the effective date of BAPCPA, this provision is not included in the citation.

7

The case of *In re Murphy*, 327 B.R. 760 (Bankr. E.D. Va. 2005)[7] has been cited frequently in recent decisions for the proposition that prepayment of a chapter 13 plan through refinancing or sale of real estate is not a plan modification. *See also In re Miller*, 325 B.R. 539 (Bankr. W.D. Pa. 2005) (agreeing with *Murphy* that a voluntary early payoff of a plan is not a modification when there is no change in the payment amount). The bankruptcy court in *Murphy* acknowledged that the early payoff of a plan would constitute a modification under a literal reading of § 1329(a)(1) – (3), but opined that "such early payoff of the plan has absolutely no prejudicial effect on any party." *In re Murphy*, 327 B.R. at 770. The *Murphy* court relied on the district court's reasoning in *Massachusetts Housing Finance Agency v. Evora (In re Evora)*, 255 B.R. 336 (D. Mass. 2000), which held that a plan is modified only if "the substance of the plan and the nature of the debtor's obligation to the debtor's creditors" is altered. *In re Evora*, 255 B.R. at 342. The *Murphy* court does not suggest, however, that because an early payoff is not a plan modification that it should be exempt from scrutiny. The court noted that "§ 1329 permits the trustee or an unsecured creditor to seek modification of a plan to increase payments on claims of a particular class when the debtor's financial position, and thus his or her ability to pay, has improved dramatically since confirmation." *In re Murphy*, 327 B.R. at 771. Because the debtor in *Murphy* did not seek to reduce the amount paid to creditors, the court declined to treat the early payoff as a plan modification "that triggers *de novo* review of previously resolved confirmation issues, such as the liquidation test." *Id*. The *Murphy* decision is well-reasoned and

---

[7]Addressing issues similar to those in the within opinion, *In re Murphy* examines both the post-confirmation sale and the post-confirmation refinancing of real estate. Although the opinion is cited as *In re Murphy,* the debtor in *Murphy* proposed to sell his real estate, while the debtor in *In re Goralski*, 03-12055-SSM, decided with *Murphy*, was attempting to refinance a mortgage loan.

practical, but it adds a threshold requirement to the application of § 1329 that is not present in the plain, unambiguous language of the statute. Section 1329 explicitly states that a plan may be modified to reduce the *time* for payments under the plan and, in a separate provision, states that a plan may be modified to reduce *payments* under the plan. *See* § 1329(a)(1) and (2). If the time for making payments under a plan is a modification of the plan only if the amount of the payments are reduced, paragraph (a)(2) of the section would be superfluous. *See In re Witkowski*, 16 F.3d 739, 742 (7th Cir. 1994). "It is well-settled that courts are required to apply the plain meaning canon of statutory construction in interpretation of the Bankruptcy Code. '[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.'" *In re American Steel Product, Inc.*, 197 F.3d 1354, 1356 (11th Cir. 1999) *quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Therefore, applying a plain meaning analysis to the statute, I find that the early payoff of a chapter 13 plan is a modification of the confirmed plan.[8]

      b.     *Should the motions before the Court be treated as motions for plan modification?*

*The Tureks*

The Tureks filed a motion to refinance their residential mortgage and payoff the balance of their plan with the proceeds. They have argued that paying off their plan early with the proceeds of their refinanced mortgage is not a plan modification. But I have found that under the plain language of the statute, a reduction in the time for making plan payments is a

---

[8]The Trustee asserts that the Tureks are seeking to modify their plan not only by reducing the time for payments under the plan, but also: (1) by paying the mortgage arrears at settlement rather than through periodic payments; (2) by funding the plan through proceeds of the refinancing rather than from disposable income; and (3) by proposing to reduce the amount paid through the plan.

9

modification, so unless I find that the Tureks should be permitted to modify their plan, the Trustee's objection must be sustained.[9]

Obviously, the Tureks' motion is not entitled as a motion to modify a plan. However, other courts have disregarded the terminology used by debtors and have treated similar motions as motions to modify a chapter 13 plan. *See In re Sunahara,* 326 B.R. 768 (Bankr. 9th Cir. BAP 2005) ("Motion to Refinance Real Estate, Pay Base Plan and Terminate Case" treated as a motion to modify plan)*; In re Green,* 321 B.R.725 (Bankr. D. Nev. 2005) ("Motion for Discharge" treated as motion to modify plan); *In re Easley*, 205 B.R. 334 (Bankr. M.D. Fla. 1996) ("Motion to Complete Chapter 13 Plan" treated as motion to modify plan); *In re French*, 2005 WL 548081 (Bankr. D. Vt. 2005) ("Motion to Refinance" treated as motion to modify plan); *but see In re Martin*, 232 B.R. 29, 32 (Bankr. D. Mass. 1999) ("A motion to refinance is not the equivalent of a motion to modify a plan.") Whether the motion to refinance the Tureks' mortgage and payoff their chapter 13 plan may be approved as a modification of the confirmed plan is determined by applying the requirements of § 1329.

I first must ascertain how the proposed financing alters the provisions of the Tureks' confirmed plan. The Trustee has argued that the Tureks' were required to pay $350.00 for 57 months, or $19,950.00, to fulfill their plan. Therefore, according to the Trustee, the Tureks not only are attempting to accelerate their payments, but they also are seeking to reduce the total amount paid to creditors. However, I find that as confirmed, the plan only promises to pay the

---

[9]The Tureks' plan provided that property of the estate did not vest in the debtors until they received their discharge. Therefore, the Tureks' were required to obtain court approval before selling or encumbering their home because it remained property of the estate. However, even if the property had vested in the Tureks upon confirmation, they were seeking to acquire new debt through refinancing, which requires the approval of the Trustee. *See* 11 U.S.C. § 1305(c), § 1328(d).

10

amount necessary to fund the plan. When this provision is read in context with the treatment of claims, it is clear the Tureks' confirmed plan only provides for payment of the mortgage arrearage, the crammed-down value of the vehicle, and any allowed priority and administrative claims. The treatment of unsecured creditors was linked to the Tureks' non-exempt assets with the debtors averring that they had no non-exempt assets. Therefore, the Tureks' confirmed plan proposed to pay nothing to unsecured creditors. Contrary to the Trustee's assertions, the only "base" amount of the plan was the Tureks' projected disposable income for 36 months as mandated by § 1325(b)(1), not the maximum amount committed of $19,950.00.[10] *See In re McKinney*, 191 B.R. 866, 867-69 (Bankr. D. Or. 1996) *quoted in* Keith M. Lundin, Chapter 13 Bankruptcy, vol. 3, §253.1 (3d ed. 2000 & Supp. 2004) ("Where the terms of a confirmed plan reveal themselves to be internally inconsistent the debtors must continue their plan payments, at a minimum, for a time sufficient to meet the requirements of § 1325(b)(1)"). Therefore, in their motion requesting approval to refinance their mortgage and pay off the balance of their plan the Tureks were not seeking to reduce the amount to be paid to creditors, but only to change the source of the payments. In fact, the Tureks were proposing to pay creditors the maximum amount that had been proposed – $19, 950.00. Rather than paying the arrearages on secured claims through the plan, however, they proposed to pay these amounts using the equity in their exempt property. Having determined that the Tureks are not attempting to reduce the amount

---

[10]As a practical matter, a chapter 13 trustee needs to establish the base amount of a plan in order to determine whether a debtor who is not paying creditors in full is committing all of his disposable income to the plan. Imprecise provisions such as those included in the Tureks' plan may be objectionable simply because they do not bind a debtor to any specific base amount at the time of confirmation. Of course, adjustments upward may be necessary if allowed claims required to be paid exceed the amount committed to the plan.

11

creditors are receiving, but only the source of the payments, I must determine whether this proposal meets the requirements of § 1329.

Section 1329(b) provides that "[s]ections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section." 11 U.S.C. § 1329(b)(1). Sections 1322(a) and (b) set forth the mandatory and permissive provisions of a chapter 13 plan. I find that the proposed refinancing does not implicate any of the provisions of § 1322(a) and (b). Section 1323(c) provides that if a secured creditor has accepted a plan, it is deemed to accept the modified plan unless the modified plan changes the treatment of a creditor's claim. This provision also is unaffected by the Turek's refinancing proposal. Section 1325(a) contains the standards for confirmation of plan – including the "good faith test" in (a)(3), the "best interests of creditors test" in (a)(4) and the "feasibility test" in (a)(6). These paragraphs are implicated, and I must determine whether the plan, as modified, meets these requirements. As to the feasibility test, the proposed modified plan is feasible. However, the Tureks did not file the motion to refinance with the intention of having it considered as a motion to modify the plan. Therefore, the record is inadequate to determine the best interests of the creditors on the effective date of the plan as modified.[11]

Whether the modified plan is being proposed in good faith also is at issue. In *Sunahara*, the Court held that the good faith of a debtor in proposing a plan modification is a significant factor for consideration by the bankruptcy court. *In re Sunahara*, 326 B.R. at 781-82. "Such a determination necessarily requires an assessment of a debtor's overall financial condition

---

[11]Although courts are divided on the issue, a majority of reported decisions considering plan modifications fix the effective date for the "best interests of creditors test" at the effective date of the plan as modified. *See* Lundin, Chapter 13 Bankruptcy, vol. 3, §254. (citing cases)

12

including, without limitation, the debtor's current disposable income, the likelihood that the debtor's disposable income will significantly increase due to increased income or decreased expenses over the remaining term of the original plan, the proximity of time between confirmation of the original plan and the filing of the modification motion, and the risk of default over the remaining term of the plan versus the certainty of immediate payment to creditors." *Id.* In the within case, the Tureks' proposed refinancing will enable them to pay off their plan early, but this fact alone does not suggest an improvement in their financial condition. As noted by the *Murphy* court, by refinancing a home a debtor simply exchanges the increase in the value of the property for a corresponding amount of debt. *In re Murphy*, 327 B.R. at 774. Further there has been no suggestion by the Trustee that the refinancing was proposed in bad faith. Therefore, I find that the Tureks have demonstrated that the proposed modification of their plan has been made in good faith satisfying the requirements of § 1325(a).

Although I am unable on the current record to determine whether the Tureks' proposed modification to their plan should be approved, it is important that I also address the applicability of § 1325(b) to the plan modification process. Courts are divided as to whether § 1325(b), and in particular, the "disposable income test" of § 1325(b)(1)(B) applies to a plan modification that provides for an early payoff. *See In re Evora*, 255 B.R. at 342; *In re Sunahara*, 326 B.R. at 774 – 81 (surveying cases). Courts that adhere to a plain reading of the section have found the omission of a reference to § 1325(b) to be significant. "Section 1329(b) expressly applies certain specific Code sections to plan modifications but does not apply § 1325(b). Period. . . . Had Congress intended to impose such a requirement, it could have easily done so by making the appropriate incorporating reference. If the absence of the reference to § 1325(b) was indeed an oversight, it is the province of the legislature, and not the judiciary, to make the correction. *See*

Case 1:04-bk-03910-MDF    Doc 48    Filed 07/21/06    Entered 07/21/06 14:22:11    Desc
Main Document      Page 13 of 17

*Lamie v. United States Trustee*, 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)." *In re Sunahara*, 326 B.R. at 781. [12] Therefore, I find that a chapter 13 plan may be modified without meeting the disposable income test.

As I am unable to determine whether the Tureks proposal to refinance their mortgage meets the "best interests of creditors test" on the current record, a hearing will be set to take further testimony on this issue.

### *The Kuykendall case*

This case views the Turek situation through a rear view mirror. That is, when the Kuykendalls filed their motion, the sale had been consummated and the sale proceeds had been distributed to satisfy secured claims. Further, the "payout" amount remitted to the Trustee had been distributed to unsecured creditors. In the Kuykendall case, however, no motion to modify the plan was filed before distribution under the confirmed plan was completed. Therefore, the issue in this case must be determined by reviewing the confirmed plan. The Kuykendalls' plan states, in relevant part, as follows:

I.  A. The Debtors submit to the supervision and control of the Trustee all or such portion of the Debtors future earnings or other future income as is necessary for the execution of the Plan, including:

   1. The total amount of $170.00 per month;

   2. Other property: Additional sums as necessary to fund Plan.

II. A. It is proposed that payments shall be made over a period of Sixty (60) months.

---

[12] As noted by the Ninth Circuit Bankruptcy Appellate Panel in *Sunahara,* while not a separate test, a debtor's disposable income may be considered as part of an analysis of the totality of the circumstances when assessing a debtor's good faith in filing the proposed modification. *In re Sunahara*, 326 B.R. at 781.

14

V.  Revestment of Property in Debtors

> Property of the estate shall vest in the Debtors at the time of confirmation of this Plan . . . .

The Kuykendalls' plan differs from the Tureks' plan in two important ways. First, unlike in the Tureks' case, property of the estate vested in the Kuykendalls on the date the plan was confirmed. Second, the Kuykendalls' plan proposes to pay a specified amount over sixty months and does not, like the Tureks' plan, pledge payments only related to the payment of claims.

According to the terms of the plan, property of the estate vested in the Kuykendalls upon confirmation; therefore, they were able to sell their residence without seeking prior court approval. Under the analysis set forth in the discussion of the Turek case, however, if the Kuykendalls wanted to obtain an early payoff of their plan, they were required to file a motion to modify the plan. Court approval is required for a change in payment arrangements to the Trustee that results in a substantive modification to the plan. As no such modification was requested in this case, the Kuykendalls were required to pay to the Trustee the base amount of $12,422.00 provided for in the plan. To achieve the desired result, a motion to modify the plan should have been filed specifying that the Kuykendalls intended to pay their creditors the amount proposed in their plan, but that the payments would be accelerated and the amounts owed to Chase and to Franklin County would be paid at settlement and not through the plan. Of course, the Trustee also would have been afforded the opportunity to offer his own proposal to modify the plan and, perhaps, would have suggested a new analysis of the best interest of creditors test. *See In re Morgan*, 299 B.R. 118 (Bankr. D. Md. 2003) (After closing agent remitted balance due under plan to chapter 13 trustee, debtor filed motion to modify plan by crediting amounts paid at settlement against amounts due under plan.)

15

## Guidance for future cases

The Court is aware that current interest rates, general lending practices and real estate market values have created a climate in which many homeowners can benefit from refinancing their mortgages or selling their property to realize the equity. It is not the purpose of the Bankruptcy Code to impair a debtor's ability to take advantage of these benefits. However, once a plan is confirmed, all parties are bound by its terms until it either is completed or is modified by the court. Debtors contemplating post petition refinancing or the sale of property outside the terms of a plan must seek modification of the plan if proceeds are to be used to obtain an early pay off. A debtor's ability to sell or refinance his property will be affected by whether the property vested in the debtor at confirmation. A debtor in whom estate property is *not* vested may not sell assets of the estate without obtaining court approval. Further, such debtor will have to obtain court approval both to sell the property and to pay off the plan early. Generally, a debtor in whom estate property is vested may sell the property without first obtaining court approval. However, if proceeds of such a sale are to be used to partly fund or pay off a plan and the plan did not anticipate this payment scheme, the debtor must obtain the court's approval to modify the plan *before* consummating the sale. In all of these situations, the Trustee and unsecured creditors also may also move to modify the plan. The standards to be employed in evaluating non-debtor requests for modification is not before the court, so these issues will be left for another day.

## Conclusion

On the present record, the Tureks' motion to refinance and prepay plan neither shall be granted or denied, but leave is granted to the Tureks to present evidence at a future hearing as to

16

whether the proposed refinancing meets the "best interest of creditors test" under 11 U.S.C. § 1325(a)(4).

Having failed to file a motion to modify their plan prior to the payment and distribution of all amounts payable under the confirmed plan, the Kuykendalls' the motion for disgorgement is denied.

BY THE COURT,

*[signature]*<br>Bankruptcy Judge

Date: July 21, 2006

*This document is electronically signed and filed on the same date.*